UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MICHAEL MARTIN,

   Plaintiff, : Case No. 2:18-cv-404

   -vs- Judge Sarah D. Morrison
Magistrate Judge Chelsey M. Vascura

FELBRY COLLEGE, LLC, *et al.*,

:

   Defendants.

**OPINION AND ORDER**

This matter is before the Court on Defendants Felbry College, LLC, and Feyisayo Tolani's Motion for Summary Judgment (ECF No. 66), Plaintiff Michael Martin's Memorandum in Opposition (ECF No. 72), and Defendants' Reply (ECF No. 74). For the reasons stated herein, Defendants' Motion is **DENIED**.

**I.    RELEVANT BACKGROUND**

Plaintiff Michael Martin worked for Defendant Felbry College, LLC ("Felbry"), from July 2017 through February 2018 as the Clinical Coordinator. (Martin Decl., ¶ 4, ECF No. 72-2.) Felbry is an accredited nursing college located in Ohio. (Tolani Decl., ¶ 4, ECF No. 67-1.) Defendant Feyisayo Tolani is the founder, sole owner, and Chief Executive Officer of Felbry. (Tolani Decl., ¶ 1; Tolani Depo., 42, 67, ECF Nos. 61, 62.)

According to Mr. Martin, he signed a document near the beginning of his tenure that accurately illustrates his job duties as Clinical Coordinator. (Martin Depo., 28, ECF No. 63.) The "Job Summary" in that document provides:

> The Clinical Coordinator serves as a liaison between Felbry College and all clinical partners, is responsible for maintaining correspondence between clinical agencies,

1

working with the Director of Nursing and Program Administrator to ensure clinical compliance with all regulatory and accrediting bodies.

(Defs. Ex. B, ECF No. 66-6.) The "Job Responsibilities" are listed as:

**Clinical Partners**

- Establishes and maintains positive working relationships with clinical agency management and staff
- Works with the Director of Nursing to secure appropriate clinical sites
- Prepares reports and documents for clinical partners as needed

**Compliance**

- Reviews and tracks student files for compliance with state board of nursing and clinical agency requirements. Collaborates with students and faculty to resolve discrepancies and reports results to the Director of Nursing
- Ensures all immunization and medical documents are filed/scanned and monitored as needed, with assistance from the Director of Nursing for interpretation as needed

**Orientation**

- Provides basic site orientation to new clinical faculty, arranges additional orientation with facility staff as needed

**Scheduling**

- Works with Registrar and Director of Nursing to create and manage student clinical assignments

**Administrative**

- Attends all administrative meetings as required
- Maintains confidentiality of student records at all times
- Attends and participates in new student orientations
- Performs other duties as requested

(*Id*.) Mr. Martin explained that the allocation of his days at Felbry were approximately two hours meeting with students and six hours scheduling and following up with student files and clinical sites. (Martin Depo., 38.)

During Mr. Martin's employment at Felbry, Camden Seal was his direct supervisor; she was the Director of Nursing, and later took on the title of Program Administrator. (Tolani Depo., 76; Martin Depo., 22, 58.) Ms. Seal described Mr. Martin's job responsibilities as facilitating new clinical affiliates, developing partnerships with clinical groups, assisting in scheduling, assisting with clinical compliance, being available to meet with students, and scheduling clinical assignments. (Seal Depo., 24, 86.) Mr. Martin was also responsible for making sure each student's health records were up to date. (*Id.* at 27.) On a day-to-day basis, Mr. Martin was to maintain the clinical schedule, audit student files for clinical compliance, make phone calls and site visits to clinical facilities, and ensure staffing was in place. (*Id.* at 33.) According to Ms. Seal, Mr. Martin did not have any job duty that was primary or more important than another. (*Id.* at 32.) However, Mr. Martin stated that his primary duty was to "audit students' clinical files for completeness and compliance." (Martin Decl., ¶ 8.)

Since Mr. Martin had no prior clinical coordination experience, if there was an issue at a clinical site, he would work with Ms. Seal to resolve it; the goal being that eventually he could handle it on his own. (Seal Depo., 34.) Ms. Seal assisted him with a few initial site visits and after that "he was the one developing those relationships." (*Id.* at 35–36.) That included, scheduling a time to meet with the director of nursing at the site, taking literature, and completing contract paperwork—that Ms. Seal prepared and signed— when applicable. (*Id.* at 35–38.) Ms. Seal and Mr. Martin disagree on whether Mr. Martin picked out clinical sites to visit, they picked out clinical sites for Mr. Martin to visit together, or Ms. Seal selected those on her own. (*Id.* at 36–37; Martin Decl., ¶ 12.) Ms. Seal also stated that Ms. Tolani would occasionally offer input on what clinical sites to select. (Seal Depo., 37.) But there is no dispute that Mr. Martin could not finalize or modify a clinical site contract without approval from Ms.

3

Seal. (*Id.* at 39; Martin Decl., ¶¶ 13, 16.) Ms. Seal believes that Plaintiff procured one clinical site contract on his own before he was terminated. (Seal Depo., 37.)

According to Ms. Seal, she helped Mr. Martin develop step-by-step instructions and checklists for how to accomplish certain job responsibilities, including making sure student files met the accreditation standards. (*Id.* at 26, 42.) Mr. Martin claims he had no input in making or modifying such checklists. (Martin Decl., ¶¶ 9–10.) If a student file was not compliant or missing something, Mr. Martin would confer with Ms. Seal or the administrative office to determine next steps. (Seal Depo., 43–44.) Ms. Seal acknowledged that to some degree, "there was a set group of policies and procedures that [were] already established" that Mr. Martin was to follow. (*Id.* at 39–40.) She explained that "[Mr. Martin] didn't always do what I asked. Often, he would tell me that, well, that just doesn't make any sense, and this is how I did it. So it would be kind of a circular argument of, but there's a reason I asked for it this way." *(Id.* at 26.) She would then try to "redirect [him] back to what had been set forth for him." (*Id.* at 26–27.)

Ms. Tolani claims that at the end of his employment, Mr. Martin gave a student a copy of his entire student record. (Tolani Depo., 202, 205.) This was a violation of Felbry policy because students were required to go to the registrar's office to request anything they needed from their student file. (*Id.* at 203.) This usually required filling out a form, depending on the request. (Seal Depo., 45.) Ms. Seal also believes that Mr. Martin turned over an entire student file. (*Id.* at 50–51.) Mr. Martin told Ms. Seal it was the student's file, "and he has every damn right to it that he wants." (*Id.* at 76.)

On the other side, Mr. Martin says he could not have given a student his entire file because he only had access to the clinical portions of the student files, not the administrative portions. (Martin Depo., 22, 160–61.) This was confirmed by Ms. Seal. (Seal Depo., 46.) Mr.

4

Martin did acknowledge that he provided a student with a copy of his Federal Bureau of Investigation ("FBI") and Bureau of Criminal Investigation ("BCI") background check. (Martin Depo., 160–61.) He points to a dissemination log that he claims he had the student sign in order to obtain these records. (Martin Decl., ¶¶ 22–24, 26; Pl. Ex. W, ECF No. 73.) However, according to Ms. Seal, Felbry did not provide students with copies of their BCI or FBI background checks because they could request those on their own through the agency websites. (Seal Depo., 48–49.)

Mr. Martin was terminated from Felbry because he "couldn't follow policy, couldn't follow direction." (*Id.* at 98.)

On April 27, 2018, Plaintiff filed a Complaint alleging two counts of failure to pay, in violation of 29 U.S.C. § 207 (the "Fair Labor Standards Act") and Ohio Revised Code § 4111.3 (the "Ohio Minimum Fair Wage Standards Act"), and one count of untimely payment of wages, in violation of Ohio Revised Code § 4113.15 (the "Prompt Pay Act"). (ECF No. 1.) On July 11, Defendants filed an Answer and Counterclaim, alleging that Plaintiff violated the Ohio Uniform Trade Secrets Act. (ECF No. 15.)

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of "identifying those parts of the record that demonstrate an absence of any genuine issue of material fact." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The burden then shifts to the nonmoving party to "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). The non-

moving party "may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan*, 578 F.3d at 374.

When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III. ANALYSIS

### A. Administrative Exemption

Defendants argue that Mr. Martin's claims fail because the Clinical Coordinator position at Felbry College meets the criteria for the administrative exemption under the Fair Labor Standards Act ("FLSA") and the analogous Ohio statutes.[1] Mr. Martin responds that Defendants waived the administrative exemption defense because they failed to raise it in their Answer, and even if they did not, the exemption does not apply to him.

#### 1. Waiver

The administrative exemption is an affirmative defense, and as such, Fed. R. Civ. P. 8(c)

---

[1] The analysis for whether the administrative exemption applies under the FLSA and Ohio law are the same.

generally requires that it be raised in the first responsive pleading or it is deemed waived. *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 846 (6th Cir. 2012). However, the "failure to raise an affirmative defense by responsive pleading does not always result in waiver of the defense—such as, when the plaintiff receives notice of the affirmative defense by some other means." *Seals v. General Motors Corp.*, 546 F.3d 766, 770 (6th Cir. 2008).

The Court recognizes that Defendants failed to raise the administrative exemption as an affirmative defense in their Answer. While not advisable, in this instance it is not fatal. In reviewing the depositions filed and the exhibits attached in support of and in opposition to Defendants' Motion for Summary Judgment (*See* ECF Nos. 61–65, 66-6, 72-2), Mr. Martin was clearly on notice that Defendants' theory of the case relied heavily, if not solely, on the administrative exemption defense. *See Dybowski v. VCE Company LLC*, 654 F'Appx 210, 216 (6th Cir. 2016). Thus, the Court finds that the administrative exemption defense is not waived and will consider the substantive arguments on its application.

### 2. Application

The FLSA requires employers to pay certain employees time-and-a-half for hours worked in excess of 40 hours a week. 29 U.S.C. § 207. However, the FLSA exempts from this requirement, employees who are "bona fide executive, administrative, or professional capacity" employees. *Orton*, 668 F.3d at 846 (internal quotations omitted). The operative Department of Labor regulation provides that an "employee employed in a bona fide administrative capacity" is one who is:

> (1) Compensated . . . at a rate of not less than $684 per week . . . ;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management of general business operations of the employer or the employer's customers; and

>(3) Whose primary duty includes the exercise of discretion or independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a). "The exemption is to be narrowly construed against the employer, and the employer bears the burden of proving each element by a preponderance of the evidence." *Perry v. Randstad General Partner (US) LLC*, 876 F.3d 191, 196 (6th Cir. 2017) (internal quotations omitted). Here, Plaintiff only contests the third element.

"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). This consideration must be determined "in the light of all the facts involved in the particular employment situation in which the question arises." *Id.* § 541.202(b). Additionally, "[t]he exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." *Id.* § 541.202(c). On the other hand, "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* § 541.202(e)."The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work." *Id.*

Plaintiff's "primary duty" is what matters for purposes of the administrative exemption. *Id.* § 541.200(a)(3).

>The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the

8

> exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.* § 541.700(a). "[D]etermining what an employee's primary duties are and whether they are covered by an administrative exemption is a fact-intensive inquiry." *Perry*, 876 F.3d at 200.

Defendants primarily rely on the assertion that Mr. Martin went on his own to visit prospective clinical sites that he developed without input from Ms. Seal as evidence of his independent judgment and discretion. (Motion, 13, ECF No. 66 (citing Defs. Ex. 14, ECF No. 66-4).) Yet, evidence in the record suggests several other possibilities: Ms. Seal and Mr. Martin picked out clinical sites together for Mr. Martin to visit; Ms. Seal actually selected which sites Mr. Martin would visit on her own; and Ms. Tolani helped select clinical sites. (Seal Depo., 36–37; Martin Decl. ¶ 12.) According to Ms. Seal, Mr. Martin only procured one clinical site contract on his own during his time at Felbry. (Seal Depo., 37); *see Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394, 403 (6th Cir. 2004) (explaining that the defendant must prove that the plaintiff "customarily and regularly exercised discretion and independent judgment in the performance of his primary duty" rather than "occasional exercises of discretion and independent judgment"). Even then, there is no dispute that Mr. Martin could not modify or finalize that clinical site contract without approval by Ms. Seal. (Seal Depo., 39; Martin Decl., ¶¶ 13, 16.)

There is also a discrepancy in the record as to what Mr. Martin's primary duty as Clinical Coordinator entailed. While Ms. Seal testified that Mr. Martin did not have one primary duty, he testified that his primary duty was to "audit students' clinical files for completeness and compliance" not select and visit prospective clinical sites. (Seal Depo., 32; Martin Decl., ¶ 8.) Ms. Seal acknowledged that with regard to this task, Mr. Martin was to use step-by-step instructions and checklists to ensure student files met accreditation standards. (Seal Depo., 26,

9

42; Martin Decl. ¶ 8.) If a student file was not compliant or missing something, Mr. Martin would confer with Ms. Seal or the administrative office to determine next steps. (Seal Depo., 43–44.) A reasonable trier of fact could find this to be illustrative of Mr. Martin's "application of skill or knowledge rather than the exercise of discretion or independent judgment." *Schaefer*, 348 F.3d at 405. To the extent these instructions and checklists did contemplate "independent judgment calls or allow[ed] for deviations," Defendants fail to point to evidence demonstrating such. *Renfro v. Indiana Michigan Power Co.*, 497 F.3d 573, 577 (6th Cir. 2007).

Finally, the Court is mindful that Mr. Martin started the position with no previous experience and thus required training and supervision in the first instance. However, Ms. Seal acknowledged that to her dismay, Mr. Martin would regularly do things his own way, requiring her to redirect him back to what she had set forth for him. (Seal Depo., 26–27.) When he did not do as instructed, Ms. Seal corrected him because there was a reason she asked for things to be done a certain way. (*Id.* at 26.) In the light most favorable to Mr. Martin, a reasonable juror could find that Mr. Martin did not have authority to make independent choices, free from immediate direction and supervision. 29 C.F.R. § 541.202(c).

There is a genuine issue of material fact both as to what Mr. Martin's primary duty was as Clinical Coordinator and whether this primary duty involved the exercise of discretion and independent judgment. Accordingly, Defendants' Motion is **DENIED** as to Plaintiff's Complaint.

### B. Ohio Uniform Trade Secrets Act

Defendants also move for summary judgment on their Counterclaim, alleging that Plaintiff violated the Ohio Uniform Trade Secrets Act ("Ohio UTSA") when he released a student's record without authorization. In order to prevail on a misappropriation-of-trade-secret

10

claim, Defendants must prove: "(1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; (3) the unauthorized use of a trade secret." *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F'Appx 860, 861 (6th Cir. 2008).

Mr. Martin argues that Defendants do not have standing to bring an Ohio UTSA claim. Constitutional standing consists of three elements:

> "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 983 (6th Cir. 2012) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 560–61 (1992)). Each element of standing must be supported in the same way as any other matter on which a party bears the burden of proof. *McKay v. Federspiel,* 823 F.3d 862, 867 (6th Cir. 2016). Here, Defendants, as the counterclaimants, bear the burden of showing that they have standing for each type of relief sought. *Id.* They have not met their burden.

Defendants complain that Mr. Martin gave a student a copy of his student file without authorization. Even assuming that Mr. Martin violated the Ohio USTA, Defendants have provided no evidence that they suffered any concrete injury as a result. There is no evidence that Mr. Martin's alleged actions interfered with Felbry's credentialing or nursing board approval. Rather, Defendants concede in their Motion that "[t]he impact on Felbry's business and credentialing is yet to be seen." (Motion, 17–18.) Instead, they argue that this alleged violation "could have, and arguably may still, have a significant adverse impact on Felbry." (*Id.* at 17.) However, "threatened injury must be *certainly impending* to constitute injury in fact, . . .

11

allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Intern. USA,* 568 U.S. 398, 409 (2013) (emphasis in original) (internal quotations omitted) .

There is no evidence of any other financial impact that Plaintiff's actions had on Felbry. Neither Ms. Tolani nor Ms. Seal could specify what economic damage was caused by Mr. Martin's alleged violation of Felbry's policy regarding releasing student records. (Tolani Depo., 205; Seal Depo., 76.) There is also no evidence that Mr. Martin currently possesses the student file at issue for the Court to "enjoin[] Plaintiff . . . from misappropriating, using or disseminating in any manner Defendant's trade secrets." (Answer and Counterclaim, ¶ 27, ECF No. 15; Tolani Depo., 205 ("The student record was given to the student.").) To the extent that Defendants allege in their Counterclaim that Plaintiff took other business documents with him when he was terminated, that argument has since been abandoned. (Motion, 17, ("The question for this Court is . . . whether the disclosure of the student records was a violation.").)

Accordingly, Defendants lack standing to bring their Ohio USTA claim, and the Court lacks subject matter jurisdiction to consider it. Defendants' Counterclaim[2] is **DISMISSED.**

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion for Summary Judgment. (ECF No. 66.) Defendants' Counterclaim is **DISMISSED**. (ECF No. 15.)

**IT IS SO ORDERED**.

/s/ Sarah D. Morrison
SARAH D. MORRISON
UNITED STATES DISTRICT JUDGE

---

[2] Although Defendants fashion their Counterclaim as two counts, the first count is merely asking for injunctive relief to address the violation in the second count. Both counts are dismissed.